FILED'11 JUL 26 9:53USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

KIMBERLY MARIE KATZENBERGER,                                  Civil No. 10-6029-CL

        Plaintiff,                                  REPORT AND RECOMMENDATION

        v.

MICHAEL J. ASTRUE, Commissioner,
Social Security Commission,

        Defendant.

CLARKE, Magistrate Judge.

        Plaintiff Kimberly Marie Katzenberger brings this action pursuant to section 205(g) of the

Social Security Act, as amended (Act), 42 U.S.C. § 405(g), to obtain judicial review of the

Commissioner's final decision denying plaintiff's applications for disability insurance benefits

and for supplemental security income. For the several reasons set forth below, the decision of the

Commissioner should be reversed and remanded for payment of benefits.

## **BACKGROUND**

        Plaintiff applied for disability insurance benefits and supplemental security income

benefits alleging disability commencing June 25, 2006. Her applications were denied. Plaintiff

requested a hearing, which was held before an Administrative Law Judge (ALJ) on March 10,

2009. Plaintiff, represented by counsel, appeared and testified, as did a vocational expert. On June 30, 2009, the ALJ issued a decision denying plaintiff's claim, and the Appeals Council denied plaintiff's request for review.

At the time of the hearing and the ALJ's decision, plaintiff was thirty-six years old. Plaintiff is a high school graduate and has some college education. She has relevant past work experience as a home health aide, caregiver, and food preparer. Plaintiff alleges disability as of June 25, 2006, based upon obsessive-compulsive disorder, bipolar disorder, and an anxiety disorder. The relevant medical evidence is discussed below.

## STANDARDS

This Court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence in the record. Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court considers the record as a whole, and weighs "both the evidence that supports and detracts from the [Commissioner's] conclusion." Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). Where the evidence is susceptible of more than one rational interpretation, the Commissioner's conclusion must be upheld. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). Questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner, Waters v. Gardner, 452 F.2d 855, 858 n.7 (9th Cir. 1971), but any negative credibility findings must be supported by findings on the record and supported by substantial evidence, Ceguerra v. Sec'y of Health & Human Servs., 933

2 - REPORT AND RECOMMENDATION

F.2d 735, 738 (9th Cir. 1991). The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. 42 U.S.C. § 405(g). However, even where findings are supported by substantial evidence, "the decision should be set aside if the proper legal standards were not applied in weighing the evidence and making the decision." Flake v. Gardner, 399 F.2d 532, 540 (9th Cir. 1968); see also Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984). Under sentence four of 42 U.S.C. § 405(g), the Court has the power to enter, upon the pleadings and transcript record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing.

## COMMISSIONER'S DECISION

The initial burden of proof rests upon the claimant to establish disability. Howard v. Heckler, 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

A five-step sequential process exists for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." Yuckert, 482 U.S. at 140; 20 C.F.R. §§ 404.1520(b), 416.920(b). In the present case, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of June 25, 2006. (Tr. 12.)

In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." If the Commissioner finds in the negative, the claimant is deemed not disabled. If the Commissioner finds a severe impairment or combination thereof, the inquiry moves to step three. Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). In the instant case, the ALJ found that plaintiff's anxiety disorder, alcoholism, and an affective disorder were severe impairments. (Tr. 12-13.) Accordingly, the inquiry moved to step three.

In step three, the analysis focuses on whether the impairment or combination of impairments meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41; see 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the analysis proceeds to step four. Yuckert, 482 U.S. at 141. In this case, the ALJ found that plaintiff did not have an impairments or combination of impairments that meets or medically equals one of the listed impairments. (Tr. 13-14.)

In step four, the Commissioner determines whether the claimant can still perform her "past relevant work." If the claimant is so able, then the Commissioner finds the claimant "not disabled." Otherwise, the inquiry advances to step five. 20 C.F.R. §§ 404.1520(e), 416.920(e). The Commissioner must first identify the claimant's residual functional capacity (RFC), which should reflect the individual's maximum remaining ability to perform sustained work activities in an ordinary work setting for eight hours a day, five days a week. Social Security Ruling (SSR) 96-8p. The RFC is based on all relevant evidence in the case record, including the treating physician's medical opinions about what an individual can still do despite impairments. Id. In

4 - REPORT AND RECOMMENDATION

this case, the ALJ found that plaintiff retains the RFC to perform a full range of work at all exertional levels, "except that she can sit 8 hours out of an 8-hour day. She can stand and walk 6 hours out of an 8-hour day with 15 minute breaks every 2 hours." In addition, plaintiff was "limited to quiet, low stress work with no public contact and only infrequent contact with co-workers." (Tr. 14-16.) The ALJ found that plaintiff was unable to perform her past relevant work. (Tr. 16.) Accordingly, the inquiry moved to step five.

In step five, the burden is on the Commissioner to establish that the claimant is capable of performing other work that exists in the national economy. Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f). If the Commissioner fails to meet this burden, then the claimant is deemed disabled. Here, the ALJ found that, considering plaintiff's age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that plaintiff can perform. (Tr. 17-18.) Therefore, the ALJ found that plaintiff has not been under a disability from June 25, 2006, through the date of the decision. (Tr. 10, 18.)

## DISCUSSION

Plaintiff asserts that the ALJ's decision should be reversed because it is not based on substantial evidence. Plaintiff argues that the ALJ erred: (1) by failing to give clear and convincing reasons for rejecting her complaints and testimony; (2) by failing to give clear and convincing reasons, or specific and legitimate reasons, for rejecting the opinion of her treating psychiatrist, Dr. Whiteley; (3) in the consideration of her treating physician, Dr. Larsen; (4) in the consideration of the lay witness testimony; and (5) by not meeting his burden of proving that

plaintiff retains the ability to perform "other work" in the national economy. Defendant contends that the ALJ properly evaluated these issues.

The court will address plaintiff's contentions in a different order than set out in the parties' briefs.

### Physicians' Opinions

Generally, the Commissioner gives more weight to the opinion of a treating source or examining source than to a source who has not treated or examined a claimant. 20 C.F.R. §§ 404.1527(d)(1)(2), 416.927(d)(1)(2); Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). A treating physician is one who is employed to cure. Magallanes, 881 F.2d at 751. His opinion is given more weight because he has a greater opportunity to know and observe the patient. Id. Controlling weight will be given to a treating physician's opinion on the issues of the nature and severity of a claimant's impairment(s) if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). "The treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability." Magallanes, 881 F.2d at 751 (citing Rodriguez v. Bowen, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)); 20 C.F.R. §§ 404.1527(e), 416.927(e); see also Montijo v. Secretary of HHS, 729 F.2d 599, 601 (9th Cir. 1984).

If the ALJ chooses to disregard a treating physician's or an examining physician's opinion, and that opinion is not contradicted by another doctor, he must set forth clear and

6 - REPORT AND RECOMMENDATION

convincing reasons for doing so. Lester, 81 F.3d at 830; Magallanes, 881 F.2d at 751; Gallant v.

Heckler, 753 F.2d 1450, 1454 (9th Cir. 1984). If a treating or examining physician's opinion is

contradicted by that of another doctor, the ALJ must set forth specific and legitimate reasons,

based on substantial evidence in the record, for disregarding the opinion of the treating or

examining physician. Lester, 81 F.3d at 830-31; Nguyen v. Chater, 100 F.3d 1462, 1466, (9th

Cir. 1996). The ALJ can meet this burden by setting out a detailed and thorough summary of the

facts and conflicting medical evidence, then stating his interpretation, and making findings.

Cotton v. Bowen, 799 F.2d 1403, 1408 (9th Cir. 1986); Rodriguez v. Bowen, 876 F.2d 759, 762

(9th Cir. 1989).


The record includes treatment notes of George M. Larson, D.O., from December 2005

through April 2008. The visits are general office visits for physical complaints, with some

notations of fatigue, anxiety and depression, with treatment from time to time with Lexapro for

anxiety and Xanax for mood swings and irritability. (Tr. 312, 313, 314, 315, 466, 469, 470, 472,

473, 310-325, 465-491.)

Upon referral by DDS, plaintiff underwent a psychological evaluation by Sharon L.

Beickel, Ph.D., on January 12, 2007, for the purpose of giving an opinion regarding plaintiff's

"'Depression, Severe Anxiety, Alcoholism, PTSD, and OCD.'" Plaintiff described herself as "a

very moody person," "an irritable person," and states she has "a ball of tension always." She

stated that she is usually happy with her family life but she makes them "miserable." She

reported that her mother had been diagnosed with bipolar disorder, her father is depressed, and

her youngest sister and she had very similar psychological problems. Plaintiff was taking

7 - REPORT AND RECOMMENDATION

medications, including Lexapro. Her sleep was not good; she didn't try to sleep until her husband is up, about 4:30 a.m.. She said, "I stand guard for my family." During this time, she checks the doors twenty or thirty times to make sure they are locked. She has trouble falling asleep and staying asleep. She sleeps off and on until 3:00 p.m., when she gets up before her husband gets home at 4:00 pm. to do housework before he got home. She them made dinner and cleaned the house. Plaintiff was both depressed and anxious, and has many "unusual" fears including fear of water after a near death experience while rafting. Dr. Beickel stated that, "It is difficult to determine whether or not she might be having some Bipolar Symptoms as she does deprive herself of sleep and does an awful lot of what might appear to be manic cleaning around the house," but plaintiff did not give her sufficient symptomology for a diagnosis of bipolar disorder. Plaintiff has a problem with anger and has physically attacked all four of her husbands. Dr. Beickel found that plaintiff did not appear to be malingering although she might be exaggerating her symptoms as a plea for help. Plaintiff's attending, understanding, and persistence in activities were within normal limits. Plaintiff was keeping up with household responsibilities. She was captain of a billiards pool league and played pool two to three times per week. Dr. Beickel's Axis I diagnoses were posttraumatic stress disorder, secondary to childhood abuse and abandonment; depression, NOS; generalized anxiety disorder; panic disorder with agoraphobia; psychological factors affecting physical condition; circadian rhythm sleep disorder-delayed phase; and alcohol dependence in early remission. Her Axis II diagnosis was borderline personality disorder with obsessive-compulsive and antisocial features. She assessed plaintiff's GAF at 50. Dr. Beickel thought it certainly would be helpful for plaintiff to enter into some dialectical behavioral therapy. (Tr. 344-51.)

8 - REPORT AND RECOMMENDATION

Agency consultant Robert Henry, Ph.D., prepared a mental summary in February 2007. He reviewed the report of Dr. Beickel and assessed plaintiff with medically determinable impairments of anxiety and depression. (Tr. 354.) In the psychiatric review technique form (PRTF) prepared by Dr. Henry, he found that plaintiff's impairment(s) were not severe, and stating that his medical disposition was based upon the categories of affective disorders - depression, and anxiety-related disorders - anxiety. He found plaintiff was mildly limited in maintaining social functioning and in maintaining concentration, persistence, or pace. Dr. Henry noted that in January 2006, plaintiff reported change in Lexapro had helped reduce angry outbursts, reduce mind racing, and increased mental calms, focus and ability to listen to others. (Tr. 355-68.)

In May 2007, agency consultant, Peter LeBray, Ph.D., affirmed the PRTF based on an overall file review. (Tr. 396.)

On February 21, 2008, plaintiff was seen in the emergency room of Sacred Heart Medical Center for complaints of depression and suicidal ideation over the previous two weeks. She complained of obsessive suicidal thoughts, but had no plan. She had resumed Lexapro but felt it was making her symptoms worse so she had tapered off over the previous two weeks. The evaluating physician's diagnoses were depression and suicidal ideation, and acute sinusitis. Plaintiff was evaluated by mental health and it was agreed to admit her to the Johnson Unit. (Tr. 504-14, 658-59.)

Upon admission, it was noted that plaintiff had "severe checking and counting behaviors" and that plaintiff said that Lexapro helped with these thoughts. It was noted that plaintiff had a past psychiatric history of depression, anxiety, and obsessive-compulsive disorder, treated by Dr.

9 - REPORT AND RECOMMENDATION

Larson. Plaintiff's mood was depressed. Axis I assessment was rule out mood disorder, not otherwise specified (NOS); rule out bipolar disorder NOS, secondary to SSRIs[1]; alcohol dependency; and rule out post-traumatic stress disorder, with a GAF of 30. (Tr. 416-18.) Upon discharge on February 29, 2008, plaintiff had a revised Axis I assessment of mood disorder NOS; rule out post-traumatic stress disorder; and alcohol abuse, rule out dependence. She was to follow up with Dr. Whiteley for initial appointment. (Tr. 412-15.)

Plaintiff was seen by H. Edmond Whiteley, M.D., on February 29, 2008, for a followup Johnson Unit medication visit. Dr. Whiteley noted that plaintiff had been started on two medications but they were too sedating. Plaintiff stated that, "'One of my phobias is pills.'" He noted that plaintiff had been on Lexapro for a year, which decreased her obsessive-compulsive symptoms such that she was no longer checking doors and burners. Dr. Whiteley noted that plaintiff has some thoughts of harming herself but no plan and no intent, and that she had no thoughts of harming others. Dr. Whiteley's Axis I assessment was obsessive-compulsive disorder, with a GAF of 60. (Tr. 555-56.)

In an outpatient psychiatric medication visit with Dr. Whiteley in March 2008, plaintiff complained of chest and arm pain and worried about blood clots. She was "'afraid of everything,'" and had an "'overwhelming fear of death.'" Plaintiff recognized that her anxiety was starting out of control, and she was having occasional panic attacks as well as increasing obsessive symptoms. She agreed to starting a medication, Abilify. Dr. Whiteley's diagnoses were obsessive-compulsive disorder, generalized anxiety disorder, and panic disorder. (Tr. 553-54; see Tr. 551-52.)

---

[1] SSRIs are selective serotonin reuptake inhibitors, commonly used in antidepressants.

Plaintiff underwent on outpatient psychiatric evaluation with Dr. Whiteley in June 2008. On mental status examination, Dr. Whiteley noted that plaintiff had a history of "quite a bit of mood lability," and had had intermittent thoughts of harming herself and others. Dr. Whiteley stated:

> IMPRESSION: While initially seen for briefer visits, the focus of the patient's complaints were on her obsessive symptoms. With this longer evaluation today, it seems that there is a significant history of mood cycling, with both highs and lows, enough to support the possibility of a diagnosis of bipolar disorder. Effects and side effects of mood stabilizers are discussed [and medications will be started].

(Tr. 583-85.) His Axis I impression was bipolar disorder mixed and obsessive compulsive disorder. (Tr. 583-85.)

Plaintiff saw Dr. Whiteley for an outpatient psychiatric medication visit in October 2008. Plaintiff reported that she was sleeping a lot. She was using Xanax but had "'anxiety and fears'" about taking any medications, one of her "phobias." She confirmed that she has not had alcohol since her February 2008 hospitalization. In discussing her ability to work, plaintiff stated that she was not reliable, she didn't sleep, and was tired all the time. Lately she had been quite irritable; Lexapro helped with that. Plaintiff was to start Lexapro at a low dose and agreed to come back to try another approach if it did not work out. Dr. Whiteley remarked after review of plaintiff's symptom course of the previous several months that there was some question regarding diagnosis. "She definitely has some obsessive symptoms, significant generalized anxiety, and occasional panic attacks. Whether she is actually bipolar or not, something which could be producing all of these symptoms with a single diagnosis, it is not clear at this point." They discussed that "she must do everything that she can to try to control this and work with treatment in spite of her concerns regarding medications." Dr. Whiteley's diagnoses were

11 - REPORT AND RECOMMENDATION

obsessive-compulsive disorder, generalized anxiety disorder, panic disorder, and rule out bipolar disorder. (Tr. 580-81.)

Plaintiff reported to Dr. Whiteley in November 2008 that it was hard to get out of bed on the higher dose of Lexapro but she'd had none of that that day and was not manic and was not irritable. She stated: "I'm not cleaning frantically now." Her OCD symptoms were "'all wiped out.'" She didn't check the doors five times and only glanced at the burners instead of touching them. She still had pain in her chest but a cardiologist and pulmonologist told her there was no problem. Dr. Whiteley's diagnoses were bipolar disorder, depressed; obsessive-compulsive disorder; and generalized anxiety disorder. (Tr. 587-88, 656-57.)

On January 19, 2009, plaintiff told Dr. Whiteley that the only medication she was willing to take was Lexapro because she had "'a phobia of pills,'" although she had "'no motivation'" on it. Dr. Whiteley noted that plaintiff's OCD symptoms continue, "moderately severe"; plaintiff checked the door five times and has to turn the knob three times and check the lock each time. Plaintiff's mentally ill mother, who was bipolar, was moving to Oregon so that plaintiff could take care of her. Plaintiff was not interested in mood stabilizers. His diagnoses were OCD; generalized anxiety disorder; and rule out bipolar disorder, depressed. Dr. Whiteley stated: "Overall at this point, the patient is barely able to manage her activities of daily living and certainly is not capable of productive work, even on a very part-time basis. Fulltime work, even very trivial work, is out of the question." (Tr. 603-05, 654-55.)

Dr. Whiteley signed an opinion letter on February 12, 2009, prepared by plaintiff's counsel, confirming a February 10, 2009, telephone conversation regarding Dr. Whiteley's opinion that plaintiff would not be able to work full-time or consistently on a part-time basis

12 - REPORT AND RECOMMENDATION

"due to the severity of her psychological symptoms." Dr. Whiteley reiterated that this was still his opinion. Dr. Whiteley indicated that he did not see any indication presently that plaintiff was using alcohol or that it continued to be a contributing factor to her psychiatric symptoms; she last used alcohol in February 2008. Plaintiff was not aggressively treating her condition because she obsessed about the potential side effects of medications that might be prescribed for her to address her conditions. Dr. Whiteley indicated that plaintiff's obsessiveness is a symptom of her OCD diagnosis. Plaintiff was currently taking a small amount of Lexapro and a small amount of Xanax, which was "taking the edge off" her symptoms, but was not controlling her conditions to the point where she would be able to work on a regular basis. Space was left for comments in the event that Dr. Whiteley needed to "correct, clarify or supplement the opinion expressed"; nothing is added to the "Comments" section. (Tr. 606-07.)

On February 27, 2009, Dr. Whiteley saw plaintiff for an outpatient psychiatric medication visit. Plaintiff had gone off Lexapro for "no reason. I find excuses." She stated that it made her not do anything; the house was clean and she wasn't able to do that on the medication. She was checking doors, windows, and stove on a frequent basis again. Plaintiff was to continue Xanax p.r.n. and try a reduced level of Lexapro on a consistent daily basis. Dr. Whiteley stated that, "The level of OCD makes it difficult for her to function, as does her constant Anxiety. Unfortunately, treatment of either disorder seems to present challenges for the other." Dr. Whiteley's diagnoses were bipolar disorder, mixed; obsessive-compulsive disorder; and generalized anxiety disorder. (Tr. 650-51.)

In a letter to plaintiff's counsel at counsel's request dated March 6, 2009, Dr. Larson stated in pertinent part that he had treated plaintiff since December 2005 for thyroid deficiency,

13 - REPORT AND RECOMMENDATION

hormone replacement, PMS, anxiety control, arthralgia, joint pain, fatigue, and depression.

Plaintiff's psychological symptoms include fatigue, panic attacks, tachycardia, irritability, and

lack of interest in life. Dr. Larson stated:

> At this time I think Ms Katzenberger might be able to work in a full or part time
> situation in a quiet, low stress job that does not include contact with the public or
> large numbers of fellow employees. Her best hope for future employment is to be
> treated by a psychiatric professional who can evaluate and treat the root causes of
> Ms Katzenberger's psychological issues.

(Tr. 648.)


### Dr. Whiteley and Dr. Larson

Over the course of plaintiff's treatment by Dr. Whiteley, he consistently diagnosed her

with obsessive-compulsive disorder (OCD) and with bipolar disorder or rule out bipolar disorder.

Plaintiff contends that it was error for the ALJ to fail to include OCD and bipolar disorder as

severe impairments at step two of the sequential process.

The regulations provide in pertinent part that, "An impairment or combination of

impairments is not severe if it does not significantly limit your physical or mental ability to do

basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a); see 20 C.F.R. §§ 404.1520(c),

416.920(c). The Ninth Circuit in Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988), noted that

a narrow construction has been imposed upon the severity regulation. The Yuckert court

determined that the severity regulation must be applied in light of the 1968 regulation which

described non-severe impairment as, "'a slight neurosis, slight impairment of sight or hearing, or

other slight abnormality or combination of abnormalities,'" (citing 20 C.F.R. § 404.1520(a)

(1968)), and Social Security Ruling 85-28 which states that, "'an impairment is found not severe

14 - REPORT AND RECOMMENDATION

. . . when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have *no more than a minimal effect* on an individual's ability to work,'" (citing SSR 85-28). Yuckert, 841 F.2d at 306. The Ninth Circuit has stated that the step-two inquiry is "'a de minimis screening device to dispose of groundless claims.'" Edlund v. Massanari, 253 F.3d 1152, 1158 (9th Cir. 2001) (quoting Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996)).

Here, the ALJ recited this narrow definition in her decision, (Tr. 11), but it appears unclear whether she applied it in this case. The record includes references throughout to plaintiff's OCD and history of OCD. For example, in May 2004, plaintiff went to the emergency department "in a state of great distress, marked apprehension and anxiety," complaining of headache. The attending physician noted her history of OCD and "this is really readily apparent here tonight." The physician stated that, "It is really quite clear from the patient's history alone that this is not a medical problem, but a psychiatric problem, although she is absolutely convinced that that is not the case. Her lack of any findings on her physical exam would corroborate this impression, as does her past history." (Tr. 226-35.) Dr. Beickel, who evaluated plaintiff in January 2007, stated that the purpose of the evaluation was to give an opinion regarding, in part, plaintiff's OCD. Dr. Beickel's Axis II diagnosis was borderline personality disorder with obsessive-compulsive and antisocial features. (Tr. 344-50.) In April 2008, plaintiff went to the emergency room complaining of leg pain and was fearful of blood clots. The attending physician noted that he had a difficult time reassuring plaintiff and stated that, "I suspect this is due to her obsessive compulsive disorder." (Tr. 492-94; see 495-96.)

The records show that plaintiff sought emergency department treatment for shortness of breath and pain in her leg in March 2008, stating she came in because she might have a blood clot (Tr. 495-96; see Tr. 530, 531; 467); she sought treatment for leg pain from Dr. Larson's office on April 4, 2008, stating she was convinced there is a blood clot, despite testing which showed there is no clot (Tr. 467) and emergency room treatment on April 7, 2008, for leg pain (Tr 492-94; see Tr. 522-24); on April 22, 2008, plaintiff sought treatment for knee and leg pain stating she had had two venous Dopplers to rule out deep venous thrombosis (Tr. 545-46); and in October 2008 plaintiff sought emergency department treatment for chest pain, reporting almost a year of chronic chest pain (Tr. 590).

In her decision, the ALJ determined that plaintiff's obsessive compulsive disorder did not result in significant work-related functional limitations. (Tr. 13.) On this record, however, it would appear that plaintiff's obsessive compulsive disorder would have more than a minimal effect on plaintiff's ability to work and should have been considered as a severe impairment.

The ALJ did not consider bipolar disorder in her decision. Although Dr. Beickel identified what appeared to be bipolar behavior, she found that it was difficult to determine whether plaintiff might be having some bipolar symptoms. (Tr. 347.) Dr. Whiteley raised the issue of a possible bipolar diagnosis in June 2008, and included either a diagnosis of bipolar disorder or rule out bipolar disorder in subsequent chart notes. The only times he actually discussed the disorder, he raised it as a possibility of a diagnosis or stated that whether plaintiff was actually bipolar was not clear. Dr. Whiteley's opinion as to whether plaintiff has bipolar disorder is ambiguous. On this record, the court finds no error by the ALJ in not including bipolar disorder at step two.

16 - REPORT AND RECOMMENDATION

Defendant contends, however, that plaintiff has failed to show how not including OCD at step two prejudiced her and that the ALJ considered plaintiff's symptoms of OCD in formulating her RFC. After determining that plaintiff's OCD did not result in significant work-related functional limitations, the ALJ stated that the condition would be considered in assessing plaintiff's RFC. (Tr. 13.) However, the court agrees with plaintiff that there is no indication in the decision that the ALJ actually included plaintiff's OCD symptoms in assessing her RFC.

Defendant also contends that any error in not specifying the impairment as severe was harmless error because the ALJ discussed the impairment and assessed limitations to activities affected by the impairment. There is no indication that any limitation resulting from plaintiff's OCD was included in the RFC analysis, and defendant does not show how they were. (See Tr. 13-14.) The record shows that, due to her OCD, plaintiff has a history of counting and checking behaviors, checking a door or window every time she goes by, for example. She obsesses about her health resulting in seeking treatment and visiting the emergency department. Because of her obsession with the side effects of her medications, she stops taking them although she acknowledges that the medications help her. In February 2009, Dr. Whiteley found that her OCD symptoms were moderately severe. It does not appear that any limitations resulting from her OCD are accounted for in the RFC assessment found by the ALJ that plaintiff is limited to quiet, low stress work with no public contact and only infrequent contact with co-workers.

The ALJ discounted Dr. Whiteley's opinion for three reasons. First, the ALJ stated that, "As noted in the report of Dr. Beickel, the claimant leads an active lifestyle with little difficulty." (Tr. 15.) Dr. Beickel's report was given more than two years before, in January 2007. Since

17 - REPORT AND RECOMMENDATION

then, the record shows that plaintiff no longer played softball and was playing pool only once a week, after which she came home and did not stay to socialize because she didn't want to have to talk to people. (Tr. 40.) More importantly, activities of daily living which are inconsistent with a claimant's alleged symptoms has been found to be a reason to discount a claimant's symptom and/or excess pain testimony if "the claimant is able to spend a substantial part of her day performing household chores or other activities that are transferable to a work setting." Smolen, 80 F.3d at 1284 n.7; see Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)[2]. However, here, the ALJ is considering a treating physician's opinion. The ALJ stated in her decision that Dr. Whiteley "indicated the claimant was barely able to manage her activities of daily living." (Tr. 15.) That is Dr. Whiteley's opinion after having seen and evaluated plaintiff for almost one year. That opinion was made with knowledge that plaintiff's mother was moving to Oregon so that plaintiff could take care of her. The fact that Dr. Whiteley's evaluation and opinion of plaintiff's activities differs from what was recorded in a medical report of an examining psychologist more than two years previous is not a reason to discount that opinion.

The ALJ discounted Dr. Whiteley's opinion because she found that it involved a vocational issue of which he has no expertise. Plaintiff argues that Dr. Whiteley's opinion is a medical source statement about what she can still do despite her impairments.

> A medical source's statement about what an individual can still do is medical opinion evidence that an adjudicator must consider together with all of the other relevant evidence . . . when assessing an individual's RFC. . . . Adjudicators must weigh medical source statements under the rules set out in 20 CFR 404.1527 and

_____

²       The Fair court noted that "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." 885 F.2d at 603.

416.927, providing appropriate explanations for accepting or rejecting such opinions.

SSR 96-5p. Although a medical source opinion about whether a claimant is "disabled" or "unable to work" is an administrative finding which is reserved to the Commissioner, the opinion on the issue cannot be disregarded and must be considered. Id.; SSR 96-8p. The opinion of a treating medical source is generally given the greatest weight in making a disability determination, but it is not binding on the ALJ. See 20 C.F.R. § 404.1527(e)(1), 416.927(e)(1); Morgan v. Comm'r of Soc. Sec'y Admin., 169 F.3d 595, 600 (9th Cir. 1999) (and cases cited). Under this authority, the fact that Dr. Whiteley opined that plaintiff is unable to work is not a reason to discount that opinion; the ALJ must consider the opinion, although it is not binding on the ALJ. Further, an opinion that plaintiff is unable to work is not a reason to discount Dr. Whiteley's other opinions about plaintiff's conditions and abilities.

The ALJ also discounted Dr. Whiteley's opinion because his February 2009 statement was written by plaintiff's attorney and signed by the doctor. (See Tr. 606-07, supra). The fact that the statement was prepared by the attorney does not make the statement any less the opinion of Dr. Whiteley's.[3] The opinion statement explains that it is a statement confirming a telephone conversation between them and it leaves space at the end for Dr. Whiteley to "correct, clarify or supplement the opinion expressed." (Tr. 606-07.) Moreover, the opinion expressed in the February opinion letter is expressed in Dr. Whiteley's own January chart notes.

---

[3] Dr. Larson's opinion of March 2009, was given in response to a letter to him from plaintiff's counsel. (Tr. 648.)

Defendant does not address the reasons given by the ALJ to discount Dr. Whiteley's opinion, but reviews all of the medical evidence. Defendant argues that Dr. Larson's opinion of March 2009 was more recent than Dr. Whiteley's and, therefore, was highly probative and eligible to receive significant weight from the ALJ. However, this was not a reason given by the ALJ for discounting Dr. Whiteley's opinion. In any event, defendant refers to Dr. Whiteley's opinion of October 2008, but the opinions of Dr. Whiteley at issue were made in January and February 2009, just one to two months before Dr. Larson's. (Tr. 15, 603-04, 606, 654-55.) It is noteworthy that Dr. Whiteley had been treating plaintiff continuously since February 2008 but the record indicates that the last time plaintiff had visited Dr. Larson's office was in April 2008 when she was seen for leg pain and anxiety. (Tr. 465-67.) Under defendant's authority stating that "A treating physician's most recent medical reports are highly probative," Osenbrock v. Apfel, 240 F.3d 1157, 1165 (9th Cir. 2000), Dr. Whiteley's opinions are highly probative.

On this record, the court finds that the reasons given by the ALJ for discounting Dr. Whiteley's opinions are not clear and convincing, nor are they specific and legitimate.

The ALJ gave Dr. Whiteley's opinion "little weight." (Tr. 15.) She gave "significant weight" and "great weight" (Tr. 16) to Dr. Larson's March 2009 opinion that "the claimant might be able to work in a full or part time situation in a quiet, low stress job that did not include contact with the public or large numbers of fellow employees." (Tr. 648; see Tr. 16.) The ALJ made no reference to the rest of Dr. Larson's opinion which followed the portion quoted. Dr. Larson went on to state: "Her best hope for future employment is to be treated by a psychiatric professional who can evaluate and treat the root causes of Ms Katzenberger's psychological

20 - REPORT AND RECOMMENDATION

issues." (Tr. 648.) Dr. Larson's opinion that plaintiff "might" be able to work, read with his opinion that plaintiff's best hope for future employment was evaluation and treatment by a psychiatric professional, is equivocal and is not a positive endorsement of plaintiff's ability to work a full-time job eight hours a day for five days a week.

It was Dr. Larson's opinion that plaintiff's best hope for employment was evaluation and treatment by a specialist; the psychiatric specialist who had been evaluating and treating plaintiff for about one year--Dr. Whiteley--opined that plaintiff's OCD symptoms continued moderately severe; she was barely able to manage her activities of daily living; her obsessiveness about the potential side effects of medications that might be prescribed for her was a symptom of her OCD diagnoses; and the small amount of medications she was taking at the time was not controlling her conditions.[4] He opined that plaintiff was not capable of productive work on a regular basis due to the severity of her psychological symptoms. As a psychiatrist, Dr. Whiteley is a specialist whose opinions should generally be given more weight about medical issues relating to his area of specialty. 20 C.F.R. § 404.1527(d)(5); Benecke v. Barnhart, 379 F.3d 587, 594 n.4 (9th Cir. 2004). The court has concluded that the ALJ erred in discounting Dr. Whiteley's opinion.

The court finds on this record that the ALJ erred in her consideration of the opinions of Dr. Whiteley and Dr. Larson.

//

---

[4]    The ALJ stated several times that plaintiff was noncompliant with taking prescribed medication. No treating source stated that this behavior was not a part of her OCD. Plaintiff stated repeatedly that medications and side effects were one of her phobias, and Dr. Whiteley specifically stated that plaintiff's obsessiveness over potential side effects of medications prescribed for her was a symptom of her OCD diagnosis.

**Conclusion**

The Court has found that the ALJ erred in her consideration of Dr. Whiteley's opinion and of Dr. Larson's opinion. The ALJ improperly discounted the opinion of Dr. Whiteley and did not consider all of Dr. Larson's opinion which is not necessarily inconsistent with Dr. Whiteley's opinion. Because of these errors, the hypothetical posed by the ALJ to the VE was based upon an incomplete RFC and is not supported by substantial evidence. The ALJ may not rely upon unsupported vocational testimony. Osenbrock v. Apfel, 240 F.3d 1157, 1164-65 (9th Cir. 2001). Therefore, the Commissioner's decision must be reversed.

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. Rodriguez, 876 F.2d at 763.

In some circumstances, where the ALJ has improperly credited testimony or failed to consider it, the Ninth Circuit has credited the rejected testimony. See Smolen, 80 F.3d at 1292 (claimant's subjective symptom testimony, physicians' opinions, and lay testimony) (and cases cited); Lester, 81 F.3d at 834 (treating and examining physicians' opinions). Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

22 - REPORT AND RECOMMENDATION

Harman, 211 F.3d at 1178 (quoting Smolen, 80 F.3d at 1292). The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. See Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003) (and cases cited).

The court recognizes that Dr. Whiteley's opinion is a mixed medical and vocational/legal opinion and that the ultimate determination of disability is reserved to the Commissioner. However, he has rendered a sufficient medical opinion. As a specialist, Dr. Whiteley has the most knowledge of plaintiff's mental condition and has treated her the most recently. While Dr. Whiteley has not assigned particular functional limitations, he has found that plaintiff is barely able to manage her daily activities and is not capable of even part-time work. The court does not read Dr. Larson's opinion, when considered in full, as inconsistent with this opinion. At the hearing, plaintiff's counsel posed the following question to the vocational expert:

> [I]n addition to the limitations in the third hypothetical, if I asked you to assume that the person would have interruptions in their ability to sustain a regular work day or a regular work week due to psychologically based symptoms and would have absences of two days per month on average or more, could the other jobs that you identified be performed?

The vocational expert responded, "No sir." (Tr. 47.) If Dr. Whiteley's and Dr. Larson's opinions are credited, there is no argument that plaintiff would not be found disabled and, therefore, there is no reason to remand this matter for further administrative proceedings.[5] The record is fully developed and remand for further proceedings would serve no useful purpose. Therefore, the court finds that this matter should be reversed and remanded for payment of benefits.

---

[5]   Because this matter can be resolved based upon the issue of the physicians' opinions, there is no need for the court to consider plaintiff's remaining contentions of error.

23 - REPORT AND RECOMMENDATION

## **RECOMMENDATION**

Based on the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g), it is recommended that the decision of the Commissioner be reversed and the matter remanded for calculation and award of benefits, and that judgment be entered accordingly.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals*. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. *Objections to this Report and Recommendation, if any, are due by August 15, 2011. If objections are filed, any response to the objections are due by September 1, 2011, see Federal Rules of Civil Procedure 72 and 6*.

Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

DATED this __26__ day of July, 2011.

MARK D. CLARKE
United States Magistrate Judge

24 - REPORT AND RECOMMENDATION